THE STATE OF MISSOURI, Respondent, *v.* PETER BROWN, Appellant.

### January 31, 1876.

1. A party charged with murder made a confession, which was reduced to writing in his presence, his precise words, however, not being used. He then signed the writing; it was witnessed, and, being proved, was read against him at the trial. He then offered evidence tending to show that his words had been misunderstood, and that he had not said what was stated in the writing. The criminal court excluded this evidence. *Held,* erroneous.

2. Where the body of the deceased had not been seen since the alleged murder, but there was pregnant evidence of the *corpus delicti,* independent of the confession of defendant, *held,* sufficient to authorize the admission of the confession.

APPEAL from St. Louis Criminal Court.

*Reversed and remanded.*

*Aug. W. Alexander,* for appellant, cited:   Wills on Cir. Ev. 84; 2 Hale's P. C. 290; 1 Stark. on Ev. 511; 1 Greenl. on Ev. 17, sec. 13; 1 Park. (N. Y.) Cr. 609; Ruloff *v.* People, 18 N. Y. 179; Tyner *v.* State, 5 Humph. 383; Mose *v.* State, 36 Ala. 231; Jenkins *v.* State, 41 Miss. 583; Pitts *v.* State, 43 Miss. 480; 15 Wend. 155; 17 Ill. 428; 4 Minn. 375; 32 Miss. 433; 33 Miss. 352.

*J. C. Normile,* Circuit Attorney, for respondent, cited: People *v.* Bagley, 16 Wend. 53; Bergen *v.* People, 17 Ill. 429; 1 Bishop's Cr. Pr., secs. 499, 501, inclusive, and note 2 to last section; State *v.* Cowan, 7 Ired. (N. C.) 344, 345; Burrill on Cir. Ev. 497, 498; State *v.* Lamb, 28 Mo. 230–232; Birdsong *v.* State, 1 Green Cr. Rep. 733.

GANTT, P. J., delivered the opinion of the court.

Peter Brown was convicted of the murder of Celia Brown on April 16, 1875, in St. Louis county, at a place called Hog Hollow, in Bonhomme township. The evidence against him consisted of numerous circumstances strongly tending to the conclusion of his guilt, and of his own full and free confession. His counsel have strenuously urged that there is no proof of the actual commission of a murder

(the *corpus delicti* in this case) ; that the body has not been found, and that the confession of the prisoner, unaided, is not enough to establish both the *corpus delicti* and his own share in the commission.   With this view they demurred to the evidence on the part of the State.   The Criminal Court overruled the demurrer, and referred the evidence to the jury, with instructions to which no exceptions are well taken.   The prisoner then gave some testimony on his part, and the jury declared him guilty of murder in the first degree.   It is not perceived how they could have done otherwise ; but the judgment of the Criminal Court must be reversed for an error which, though it may not have contributed to the conviction of the prisoner, may yet possibly have done so ; and, in capital cases, even the possibility of prejudice, through error of the court which tried the accused, is fatal to the judgment pronounced on a verdict of guilty.

The error referred to consists in the exclusion of legal and proper evidence offered by the prisoner.   It appears that the deceased was his wife ; that she and the prisoner resided at the place of the murder, in a small house of two rooms, on the ground floor ; that she wished to come to town ; that he was opposed to her so doing, and that quarrels had ensued between them on this subject, during which, and following which, he had used very threatening language to her.   He declared to some of his neighbors, a very short time before the disappearance of his wife, that he would kill her if she persisted in her purpose of going to town. The last time she was seen alive by any of the witnesses (who, as well as the prisoner, were, with the exception of the policeman and a witness to character, persons of color) was on the evening of April 15, 1875.   She was then engaged in ironing some of her dresses.   Next morning, about nine A. M., the house was discovered to be on fire, and some of the witnesses ran thither to extinguish it.   They found a puddle of blood on the floor, near the hearth, on which ashes had been strewn.   In the back room, in a

corner, lay what the witnesses call "a bundle," looking like a bed rolled up. The fire was in the front room. They extinguished it; but, though they did not see the deceased at all, no one seems to have gone into the back room. The dresses she had ironed the day before were hanging up in the front room. The fire was in the bed, in the front room, and the clothes were bloody. The prisoner arrived while the persons who had come to extinguish the fire were still at work, and threw on the fire the clothes which had been taken from the bed. On being remonstrated with, he rescued them from the fire. He told some relatives of the deceased that she had gone to town. That night he asked his brother, who lived near, to help him to remove the body of his wife from his house and throw it into the river, which was less than a quarter of a mile away. He said he had killed his wife, and wished to conceal her body. The brother refused to help him. That night, at a late hour, he went over to his brother's house and spent the remainder of the night, and about the time he reached his brother's house his own was on fire. It was entirely consumed. Prisoner then went to Junction City, Kansas, and was arrested and brought to this city on or about May 10, 1875. Being in the office of the chief of police on that day, he made a confession in presence of Stiles, Fox, and Harrigan. Stiles wrote down what he said, and the witness signed it. Stiles admits, however, that he changed "the language and grammar" of the prisoner in reducing his confession to writing. Fox and Stiles signed the paper as subscribing witnesses. It was carefully read over to the prisoner before he signed it. It was not procured by threats or promises, and appears to have been freely made. It is in the following words: "I, Peter Brown, of my own free will and accord, in the presence of L. Harrigan, chief of police, Capt. W. Fox, and A. J. Stiles, make the following free and full confession of the killing of my wife, Cynthia Brown: I think it was on Thursday, 15th or 16th of April,

about eight o'clock A. M., that we had a quarrel in regard to her leaving me and coming to town to live; and she cursed me and called me a God damned son of a bitch, and I picked up a club of wood and struck her over the head with it twice, knocking her down and killing her. She expired in a few minutes after I struck her. After killing her, I wrapped her up in a bed-quilt and carried her into the other room, and laid her in the corner. I then took a chunk of fire out of the fire-place and put it in the bed; after which I thought it would be too cruel, and thought I would put the fire all out, and left the house thinking I had; but I expect some of it was still in the straw, for after I went away it broke out again, and was put out by John and Joe Morris; but I don't think they saw the body in the other room, for they said nothing to me about it when I saw them afterwards. At night I returned and carried the body to the river, where I fastened a sack containing a large rock to the body, and threw it into the river. After throwing the body into the river I came back and set the house on fire, and then went away to my brother William's and staid all night, and in a few days went to Junction City, Kansas, where I was arrested. No one had anything to do with the killing but myself. After the killing I told my brother, William Brown, and asked him to help me carry her to the river, but he refused to have anything to do with it. I know right where I throwed [*sic*] the body, and will tell the officers, so that they can go and find it. It is just below a large sycamore tree where I throwed [*sic*] her in, about four hundred yards from the house, in a straight line."

This confession was proved to have been made and signed by the prisoner; and Capt. Fox, who was examined by the State, was able, independent of the writing, to repeat all the material statements of it, as he heard it at the time. On cross-examination he was asked: "Did not Brown say that he struck her with a *stick* instead of a club of wood, and at the same time described its size by comparing it with

his thumb or finger?" The counsel for the State objected to the question, "*because the statement of the accused is in writing, signed by himself, and cannot be contradicted by him.*" The objection was sustained, and the prisoner excepted.

Stiles was sworn as a witness for the prisoner, and, after stating that the prisoner signed the confession as taken down by him, after hearing it read, the counsel for prisoner offered to prove by him (Stiles) that, at the time this confession was alleged to have been made, "the prisoner said that he was greatly excited when his wife called him a God damned son of a bitch, and that he struck her with a stick without any intention of killing her—with a small stick, about the size of his thumb; and, generally, the counsel for the accused offered to prove the inaccuracy of the statement or confession signed by Brown, and to contradict it." The court ruled that such evidence was incompetent, to which ruling the prisoner excepted.

This was manifest error. But for the reason assigned for excluding the question asked of Fox, we should be at a loss as to the possible reason of the action of the Criminal Court. If the bill of exceptions correctly narrates what occurred, the court seems to have supposed that there was an analogy between the written contract, which is the result of a long negotiation between two parties, and the confession in this case. Obviously there is no analogy whatever. When two parties meet to make a bargain respecting a controverted matter, it would throw no light upon the conclusion at last reached and made the basis of a settlement to know their respective pretensions on first opening the conference, and their successive approximations to an agreement. When the question arises, "What contract did they make?" it would be worse than useless to inquire what were their positions before they agreed at all, and, if they committed their agreement to writing and signed it, the written instrument is so plainly the best and only evidence of the understanding

reached by the parties, that words would be wasted to show that all the disputations which preceded that conclusion are wholly irrelevant. But, when a person is giving a narrative of a past transaction, every word he uses, the very gestures and emphases he employs, go to make up the picture he gives of the event which he describes. If, after stating his recollection diffusely in words, the narrator should himself sit down and in his own language write down what he considered the substance of his narrative, no one, we think, would consider that this more studied statement was more likely to convey the image of the real event to the hearer than the diffuse terms before employed. In such cases, the more naturally and unpremeditatedly the words fall, the greater is the credit due to them. When, instead of writing down his statement in his own language, his words (or the *substance* of them) are taken down by a transcriber who admits that he changed the " language and the grammar " of the speaker, it must be very clear that there is room for mistake in the sense which the speaker desired to convey, and when a man on trial for his life offers to show that, not only has his language been changed, but his meaning perverted, it is grave error for a court of justice to silence him. We wholly approve the action of the court in admitting the confession of the accused. It is by no means an uncorroborated confession. Even if it were, there is abundant authority for holding it to be sufficient to warrant his conviction; but this question does not arise here, neither do we perceive that there was much probability of the prisoner making good the offer of proof which the court rejected. We cannot weigh probabilities, however. The prisoner asked to be allowed to prove what, if he had succeeded in doing (for his offer was very broad, and the practice of passing on such offers in this form is not to be commended), might have at least mitigated his guilt. He had the clear right to make the proof offered; and, for the refusal to permit him

to attempt to make it, the judgment is reversed and the cause remanded for a new trial.

There is another matter, to which no attention was given by counsel, but which we cannot overlook. The indictment is for the murder of Celia Brown. The confession is of the murder of Cynthia Brown. As a person may be guilty of murdering Celia, and innocent of the murder of Cynthia, and as by no intendment, in the absence of evidence, can an inference be drawn that Celia and Cynthia are the same, we express the hope that, if this case again comes before us, this particular point will not be left in doubt. The other judges concur.